if I could. Members of the Court, good morning. Our position is that this case really focuses in on the fact that at the time this disputed cost report was submitted in 2009, there wasn't an ambiguity in the regulations text. It was very clear as that regulation was written that a cost report with a year start of January 1, 2008 was still within the transitional period, the three-year transitional period for blended payments that had been established. And the regulation doesn't just say it once, it says it twice. I mean, as corrected in 2005. Are you talking about what's in the Code of Federal Regulations at the time or what was in the Federal Register? Both. With respect to the body of the regulation, this distinction in the CFR, between the CFR and the Federal Register, applies to the last section, 4, where they had the language about for cost reporting periods beginning on or after, and they had, as published in the CFR, it said July 1, 2005. But if you look to the 412.426A, it says for cost reports except as provided in paragraph C, for cost reporting periods beginning on or after January 1 of 2005 through January 1 of 2008, so that's once. And then with respect to the third transitional year, which is what we're in here, subparagraph 3 there says, again, cost reporting periods beginning on or after January 1 of 2007 and on or before January 1 of 2008. So the regulation, the July thing, it's an interesting issue, the fact that there's this distinction between the CFR and the Federal Register, but it really doesn't at the end of the day. I think it's a red herring in terms of the distinction. You say you went under either. I'm sorry? Well, you say you went under either. That's correct. Because the regulation's plain language says if you're filing it and it's by January 1, 2008, then you're within the period. Well, you're saying there's this one, so there's this one day that has an overlap, where you're saying basically the hospital can choose whether it wants, how it wants to submit. Does it want the 100 percent or the 75 percent? Is that your argument? Yes, sir. I mean, in fairness, that there actually, that appears in the earlier year provisions as well, that overlap. Right, but the one day of each year, always January. That's right. That's right. Why would there just be that one day that gives the choice to the hospital and not, you know, not February 20th, if that's when your cost report runs? Judge, I don't know, other than to say that it ends up, I mean, that's the ambiguity that's been seized upon. And I'd suggest that as a practical matter, it really doesn't end up being an ambiguity because, as Greenbrier experienced, when they originally, they submitted their cost report, and they were told, of course, for the prior year, it wasn't their pick. They had wanted to change their fiscal year. And so the intermediary said, all right, use your end date of December 31st, 2007. Now, they knew, the intermediary understood and knew that was the second year period for Greenbrier. So then, obviously, for the next one, Greenbrier submitted it first with January 108, and that's when it got rejected because of this. They tried to submit it for December 31 of 07, and the computer wouldn't take it because it says, well, you can't get paid twice for the same day. So this is not, I mean, for all the weight that we're putting on this alleged ambiguity, there's no evidence in this record that this has caused any issue. And, in fact, CMS allowed this language to sit in this regulation for how many years? From 05, 06, 07, 08, 09, until. Although there were charts in the Federal Register for years showing differently. Well, there are. But let me, it seems to me your argument that this is unambiguous in your favor turns on the fact that, look, for that overlapping date, it, on its face, lets you apply to both, and that should be viewed to allow you to make the option, the hospital to make the option of whether you want to go for the 100% or the 75%. Why, what in the regulation says you get to decide versus the government? I mean, I, Judge. Right, you're saying it should be read to say you get the option. Why can't, why shouldn't it be read to say the government gets the option? Well, Judge, all I can, I mean, again, as I, as I read it, it says that you can do, I mean, if you pick that, that year, if you have a cost reporting period beginning on or after January 107, on or before January 108, and, and then it shows up again later that, you know, before. And I understand that. But it's basically there's two, there's two boxes you can fit in. I understand that. I, I agree with the, with the, with how you're reading this, the regulation. But I guess my point is you're saying because there's two potential options for that single date that you get you, your hospital gets to choose. But why can't the government say we get to choose? Well, I mean, I think that the government, I, I'm not, I'm not opposed. I, even if the government could choose, Judge, here's the, the, the, what you're left with is the fact that the Greenbrier has only experienced at this point two of the transition years. And the, see, one thing that CMS has said clearly when they're, in terms of a clear expression of its policy, is that you get three. Whether you want it or not. In other words, you can't come in and say, look, I just, I'm just going to file for two of these transition years, and I'm not going to. So you get three, or just that it depends on when you file and which cost reporting period you file within? Well, I think that, I mean. You're not guaranteed, or unless I'm missing something, you're not guaranteed three stages. Well, I think what you're, what the way that this was fashioned is that the cost reporting periods are typically one year. Sure. And so. I assume that's your call, or are you mandated to, to, to report on a regular basis? I think you have to do it every year, but I don't want to, I can't tell you, but I know. Well, in any event, that's, even if that's true, that's a separate regulation that's requiring. Let me just ask you this. Why isn't this pretty obviously just a Scribner's error? Well, Judge, I think that this doesn't, I don't know that this rises to the level that would allow that. I mean, to be a Scribner's error, first of all, there has to be a pretty significant ambiguity, and I don't think that this, I don't think that this meets that test. The, in my reply brief, I, I provide some of the sites and language regarding the. Well, why does it have to be ambiguous? Why can't we just say, look, you know, I suppose you could make the argument, as I take it you are, a date isn't ambiguous. The date is the date. Right. Okay. Fair enough. But why does, why do we, is there some doctrine that requires ambiguity in order to find a Scribner's error? Well, Judge, I think there's a, there's an argument that requires that there be either an absurd or unreasonable result. In this case, there's no. Well, just how, how about the fact that the reg just doesn't work? You have two different rules if you have a cost reporting period that starts on January 1. Well, there's actually, but there's no evidence in this record that this didn't work, Judge. It was working fine. I mean, in fact, that the. Well, but you're being paid X and you're being paid Y. Well, you would be. Nobody seriously thinks that that's the right rule. Well, Judge, in fact, though, in terms of Greenbrier, Greenbrier was, was going to be paid one amount. I mean, that's what the, the PROB, in fact, found. They should have been paid the, the third year transition amount. That's what they'd applied for. They didn't pick this date to, to do this. This was the date that was given to them by the intermediary. Start, start year three, January 1, 2008. If you go back in time and, and just, and you're the, you're the provider in this case, what, what do you, what are you presented with at that point? You've got a regulation that says, hey, if it's, I'm going to submit my third year cost report, January 1, 2008, because that's the next date, chronological date after my last one. And, and they submit, they try to submit that date. They have a regulation that says that qualifies for the third year period. In fact, it says twice that you're still within that time frame. And they submit it. And then, of course, we get into this and, with this claim, well, that was all, that was all just an error. If, if in fact, I mean, if in fact this is that much of an error, CMS's behavior and conduct thereafter doesn't seem to be consistent with that, because of this, they let this sit for year after year after year. Your Honor was correct that they did have these other statements in the preambles to regulations with the, with the different dates of the reg. It's interesting, though, that one of the statements that was sent out in, in the provider manual predates the 2005 correction. So, they're, they're putting out those dates, and then in 2005, they're coming out with something that they declared, this is agency policy, this is a correct expression of agency policy, and it ends up with the January 1, 2008 date. So, you know, I think it's, it's difficult to say that those are, are expressions of CMS policy when CMS is then, in fact, saying other things when it engages in formal rulemaking. So, from the provider's standpoint, they're doing everything they can to comply with the rules and submit the reports as they're, submit the cost reports with the dates that are consistent with the requirements. And then they're told they come up with, with these kind of issues. I'd suggest that the, the Scrivener's error thing, Your Honor, as I've, I appreciate the law in that area, is, is a very restricted doctrine that's, that's not used in the absence of some evidence to show that there's an absurd result from this regulation. And there's no. Well, what about the fact that you're told, given this particular cost, this, this submission. Yes, sir. You are governed by formula A, and at the same time, formula B. On any other date, it would be either formula A or B. It wouldn't be both. Yes, sir. But it is, I mean, what, I'm not sure that that, why that's. Well, but it's the only, it's the only absurd result if it creates absurd consequences ultimately. And again, as I said, there's, there's no evidence of some avalanche of claims where people are having a problem figuring out which year they fall into. You know, a lot of this ends up being, as it was with Greenbrier, computer driven. They can't submit the same date under two cost reports. So the fact that they, that they follow the regulations dates, apply for a, for the third year transition period using a date that's expressed in the regulation. I don't think that's the, I don't think that rises to the level of any kind of absurdity. And in fact, it hasn't been suggested as an absurdity by CMS. They just, they claim years after the fact that it's a typo in the 2011. Right, well, they're claiming Scribner's error. That's, well. Essentially, that's what a typo is. That's true. Of course, at the time they say it, they, they, that regulation, and they go through that entire rulemaking process just for this one provider who's the only provider. Would you acknowledge, would you acknowledge that there are a lot of areas of the law that rely on calendar year? That's true, yeah. We do a lot of things based on calendar, you know, tax rates. Any number of things are calendar year. I've never heard of a legal system that turns on January 2. It's, again, I mean, I think it's a, it's a choice that they, that, that CMS could make to, and, and in fact did make. I think if you wanted to change it, there's. There's no question. If, if, if they wanted to choose randomly my birthday, February 27th, yeah, they could do that. So I'm not saying that it's, you know, illegal or unconstitutional. The point, though, is there's no real indication that that's what they intended. Doesn't the history of this suggest that it's more likely to be a Scribner's error? Judge, I would, I don't know that. In fact, the history of this, we don't really, we don't really know what was going through their mind at that time. I mean, not on this record. It was the summary judgment. Well, but the original regulation didn't have this overlap, right? It went from, pardon my, remembering, misremembering. July or June. Yeah, it was June 30th rather than July 1. And all they're doing now is they're saying, they say January 1, but they probably meant December 31st. Which would be consistent with the tradition of calendar year analysis. That, that, it is true that they corrected it. They changed it from the mid-year to the, to this period here. But they also made this fairly definite statement in the regulatory action of on or after. And then they repeated it. I mean, it wasn't something they said, no, it's true. In fairness, there's no question, you're absolutely right. The law says what it says. The question is, given that it really just kind of falls apart, if you apply it literally, we have to figure out something to do with it. I guess, Judge, I mean, again, my only, my only contest with that statement is that in, there really is no evidence of this falling apart with anything. In other words, the only provider that appears to be affected by this is Greenbrier. Greenbrier was affected. So is your theory basically when the formula isn't clear from the reg, you know, when the report is January 1, then it's essentially a dealer's choice. You get to pick. Judge, I mean, it does say, by using the language that's in the regulation, where they're saying on or before a date, then, and having a section that says, we're going to base, we're going to go 100% federal per diem payment on or after January 1. For that particular point in time, you're right, you're on that fulcrum. You're on both. Right. You fall within two different statutes. That's correct. And, well, you have two different payment methods. Sorry, two different provisions. That's right. And, but that's a, that's a choice that I'd suggest, there's nothing legally impossible about that choice. If CMS wants to adopt a regulatory scheme like that, and then put it out there. But you don't have any reason why that would be the only day that has that overlap. Judge, I don't, I can't speak for CMS. I mean, you know, what, I'm in a, if you're, if you're me or the provider, you're in a posture where you're just trying to comply with these rules. Of course. And so you see them, and you, and in this case, you have the extra layer that's applied to that, which is that my client wasn't picking these dates at random. They were, in fact, when they, once they announced it, hey, we'd like to change our fiscal year to be a year. But your theory is not that the, the person who wrote the regulations intended a dealer's choice rule. Your view is just that should be the default, that sort of the gap filler that we should provide. Or a penalty on the government when they mess up the regulations. Is that sort of the idea? Absolutely not. I, I think that, I think that the, the default rule is that we ought to apply these rules as they're written. That if the, if there's a suggestion of an ambiguity. But it's not the point that we can't apply these as, as written. We have to come up with something. Well, but in this case, Judge, I, I, I, I don't, I don't think I understand that, that argument. Because it can be applied as written. Well, you can't apply two formulas simultaneously. No, sir. But we're not asking you to. We're, Greenbrier's not asking, not advocating for, for two different. Right. You're, you're doing what you say, you, you get the one that you choose. We, the one that we choose. I suppose another option would be to average them. But, I mean, I don't, I don't see what source of law tells us would in doubt go with you. Or would in doubt average them. Well, Judge, I mean, again. I'm just looking for a rule here. Well, I think the rule is that if you adopt a regulation, this is law, all right? If, if CMS wanted to change this, and they ultimately did, they know how to say that. They left this in place for six, seven years, however many years that they had this on the table. The provider complied with it, and complied with it sort of by force, by being forced into that position once they announced they wanted to change their fiscal year. If CMS, I think at this point, once you have a regulation that's, that in fact is clear on its faces to the date. We may, we may argue that that leads to a, leads to this interesting conundrum of what year are you going to fall into. But there's nothing, there's nothing in the regulation that says that that's actually a problem. In other words, we can sit here and come up with ways we can imagine, well, that could cause a problem if A, B, or C. But there's no evidence. Well, it's a problem of who gets to choose. Do you get to choose, or does the government get to choose? Well, I think. That's, that's the issue. I mean, I, I'll agree with you, Judge, except to the extent that I think that the real, to me. And so maybe your argument is, as Judge O is suggesting, that it's the government's fault. The, the hospital gets to choose. I mean, I think there's a lot in this record that you could, that you can certainly say that the provider is kind of getting done to a little bit here. I mean, from the standpoint of, they, they have a cost report with these periods that they were forced into. Those periods complied with the, with the state of regulations at the time. And then thereafter, they've got the agency engaging in this apparently fairly vigorous effort to try to unwind that just for them. Including going to the problem of adopting a rule that could only affect one entity anywhere, which is my client. So I think that the agency, I think that the client, the provider in this case has a legitimate point of saying. All right, you've saved five minutes for rebuttal. We'll hear from the government. May it please the court, Daniel Aguilar for the Secretary of Health and Human Services. We think that there are two ways to resolve this case, and Greenbrier's offering a third way. The two ways that we think that this case can be resolved is either one by, as the Supreme Court instructed in Kaiser. You know, going through a very thorough textual analysis, applying all the relevant tools of construction. And trying to figure out how to resolve this uncertainty in the regulation. And we think that applying the rule of the Scrivener's Error. And by looking to the preambles that were contained in the federal register, accompanying these rules, that you can permissibly use both of those to resolve this uncertainty. About what happens for a cost reporting year that begins on January 1, 2008. We think that resolves it in our favor, in the administrator's favor, that you get paid the entire federal per diem rate. The second way to resolve it is, if you don't think that you can resolve that ambiguity that way, that the text must be read literally. Then what it says is that you can be paid under A3, the blended payment, or A4, the entire federal per diem payment. And the administrator here said, we will reimburse you that entire federal per diem amount. And under review under the Administrative Procedure Act, that's not an arbitrary and capricious decision. That's not contrary to law. So under your backup theory, effectively the government gets to choose. Well, I think that that is what is explained in the 2004 original rule, right? Is CMS said we want to have this three year transition period. When we see comments on that. And they got a lot of comments. And one of them was from several hospitals and providers who said, we want to be able to choose our reimbursement rates. Maybe we don't like this transition year you've set out. We want the option to be able to just be paid solely under the federal per diem amount. And CMS, in the 2004 rule, explained no. We don't want that kind of complication added to the system. We want a three year period, no shorter, no longer, that revolves over on these specific dates that we've let out. And we don't want to have hospitals have the option to make their own choices. This is a system that we have. And so in that 2004 rule, they erroneously aligned it to the cost update year, when they add in new data and new variables to figure out the per diem payment. In the 2005 corrections, they said, sorry, that was our error. We meant to align it to the calendar year. And unfortunately, instead of saying December 31st and January 1, they used January 1. That's where this uncertainty arises from. It's because now, for a single day out of the entire year, there's an overlap. And every other day of the year, if your cost reporting period starts on that day, you get paid under one reimbursement calculation. And they're mutually exclusive. There's no way that you can get a double reimbursement, or we're not going to have no reimbursement, if it's otherwise properly submitted, right? And so just for one day out of the year, A3 and A4 both apply. And that clearly is a Scrivener's error, as this court explained in Heck versus Trish, when it encountered something else that was a clear mistake on its face. In that case, it was a Louisiana securities law that appeared to impose liability, even if you exercise reasonable care. And the court said, that's a mistake. Let's look at the history of that. And it discovered the history was the Louisiana legislature was trying to solve another problem. It deleted some language and introduced this error. And the court said, we can reasonably take account of that. We can construe the statute to just be imposing a negligence standard, even though read literally, it doesn't do that. But we understand that that's what the purpose of this was. And we can account for that. And as the Supreme Court explained in Kaiser, even if a regulation is impenetrable on its face or makes your eyes glaze over, you can still go through and use the text, the history, the structure, and the purpose to construe what it means. We think here, similarly, there is a Scrivener's error. Instead of December 31st, it said January 1st, creating an overlap. And you can account for that looking back at the original rule, saying we don't want overlapping dates. We want these to be mutually exclusive. And then the correction saying we want to align this to the calendar year. And applying those tools and the preambles to both the 2005 rules, saying we don't want to have a change in policy. And every other preamble to the Federal Register updates to what the per diem payments were going to be. Each of which said, for cost reporting years beginning on January 1, 2008, you will be paid entirely under the Federal per diem amount. You can take those contextual clues and construe the regulation here to provide for reimbursement under the amount that the administrator gave. I'm happy to answer any questions that the court may have. All right, we have your argument. Thank you. We'll hear rebuttal. I think you have to ask, if this is an error, if that's the position CMS is going to take, then where was some statement to that effect in all of those years? I grant you they had this language in the preamble every year. But what you don't see in any of those publications is, oh, by the way, that stuff we have in that regulation is wrong. But that's always true. I mean, the Louisiana statute that he just talked about, that had been on the books for years. I mean, whenever these issues come up, there's only going to be a scrivener's error if it's not corrected by the time it gets to court. Well, but Judge, I guess the difference being that in here, in this instance, we have the benefit of the legislature, if you will, CMS, the agency that has the rulemaking power, getting to express itself on repeated basis. The only times that they make a clear expression about what is our policy, it is to verify and lock in on the language that's in the regulation, which they did in 2005. All these other occasions that they say things about it, they never once say there's a problem in that regulation. Nor when they tell my client to use the December 31st end date for its second year, do they say, oh, and by the way, this will knock you out of your third year because we're going to change what we think that regulation means. I mean, it's ultimately, I mean, I hate to get up and bang the table and say, gosh, this is unfair, but gosh, this is unfair. And for a regulated entity that's trying to follow the rules and do what they're told, to tell them that, well, you can't rely on what's in that regulation because later on, six years, seven years down the line, somebody's going to come up and say, well, we think that was probably a mistake. When was this table produced in the Fed Reg? Judge, there's a number of those that they, apparently, they put those out on a routine basis every year. But for the client. Why didn't that provide you some notice? I'm sorry, sir? Why didn't that provide you at least some notice? Well, I mean, Judge, for a couple of reasons. Number one, those tables, while they're in the preambles to regs, aren't part of the regulations themselves. I mean, the client is looking at the compiled group of regulations in the Code of Federal Regulations is not likely to come across those. And if they did, those things still don't have the force of law, unlike the regulation itself. So, and finally, I would point out, as I mentioned earlier, that while CMS did make those statements, they also made those statements and then subsequent to that, adopted this language that we're fighting about here now. So, you know, I don't know that it's, that we can place the burden of that notice on a provider who sits down and looks, okay, what's the rule? The rule's January 1, 2008. Well, that's the first date of our cost report. So, we're okay. And only to be told later that they're not. Well, but in fairness, you see the other rule, too, right? I mean, anybody who reads just, as you say, if they're just being a textualist as to the reg, you're going to be confused. I mean, Judge, I'll give you that. But I guess where I, the problem I have with that is ultimately, something's, a problem, a difference or an ambiguity or a change in language or the fact that language can be interpreted multiple ways is only a problem if it's a, if it becomes a problem for, there's no evidence here that there was a crowd of providers getting, you know, in some spot where they were, where CMS was having to make these decisions. In fact, CMS has never even heard of this until years later, apparently. I mean, that's when they finally went and changed it in 2011. Did I hear you earlier saying that you're the only regulated entity to your knowledge to have faced this problem? That's my understanding. We're certainly the only regulated, let me put it this way. Everybody else has just filed on December 10 or whatever. We're the only regulated entity that was, that still had a cost report in play, as I understand it. And I'm, my only source of information there is I can look at this, the online listing they have of the open administrative actions. There is no other entity that's, that's this, the inpatient psychiatric facility that has something like this going on by the time 2011 comes along and this language is passed. I think it's also. Maybe most hospitals understood that if it was on January 1st, you had to be at that, as the chart shows, had to be at the 100 percent per diem. I mean, I suppose that's possible, but I don't know. We just don't know. But I don't know. I don't know one way or the other. I don't, I don't know that other hospitals were in our position where we didn't, we had to just. And in fact, my understanding is some hospitals preferred the per diem. It's not that this rule benefits one side or the other. It depends on if you're a high or low cost hospital. You're apparently a high cost hospital, so you'd rather have the cost reimbursement. Well, that's how it happened to work out. But again, I mean, the date was not a matter of our choosing. I do think it's also relevant that when CMS made, in 2011, makes this change. They do so with an enactment that specifies an effective date of 2011, July of 2011, after that enactment is passed. The application of that new provision to a 2009 cost report, I'd suggest, is questionable. That's what the PRRB, in fact, relied on in large part in saying, well, that's, we're not going to apply that. All right. Thank you very much. Case is submitted. Thanks to both sides. Call our next case.